Thomas, Justice, delivered the following separate opinion : I concur in the judgment of the court, in this case, but not in all respects, in the opinion on which it is predicated, or in the opinion of the court in the case of Phœbe v. Jay ; I therefore deem it proper, considering the importance of the principles involved, to give an exposition of my views on some of the most prominent points in the case, and will proceed to do so. The question presented by the record involves the right of the appellee to require of the appellant “ a specific performance ” of a certain indenture by which she was bound to service to one William Padon, in 1815, in conformity to the provisions of the law of the territory of Illinois, then in force, authorizing such proceedings, and which indenture had been subsequently assigned to the appellee, in conformity to the several laws of the territory and state of Illinois, in such case made and provided. The counsel for the appellant, denying the validity both of the indenture and assignments, assume several positions, which I propose to notice, in the order in which they are stated. They contend, first, that as well the territorial laws, under which the indenture was made and assigned, as the 3d section of the 6th article of the constitution of the state of Illinois, confirmatory of acts done under those laws, were, and are in violation of the 6th article of the ordinance of 1787, and that, consequently, the indenture relied on by the appellee, originally was, and still is void. In this position I do not concur. That the laws authorizing the indenturing and registering of negroes and mulattos within the territory of Illinois contained provisions in contravention of the ordinance, and therefore void, I do not doubt. Nor do I deny that many of the acts of indenturing, and all of registering, done under those laws, were introductive of involuntary servitude within the meaning of that instrument, and therefore legally insufficient to bind to service the persons indentured or registered, as the case might be. But I, at the same time, maintain that those laws were not in all respects void, and that indentures might have been, and doubtless were, in many cases, entered into under them voluntarily, and without “fraud or collusion,” and that [* 347] all such indentures were then, and are now, valid. Indentures however, procured by improper means, were, in my opinion, void in their inception, and could not, if it had been intended, have been made good, as such, by our constitution. The power of the people, in their primary, sovereign capacity, broad and comprehensive as it undoubtedly is, is not so plenary, as to enable them to infuse vitality into a contract void ah initio. Nothing short of omnipotence could do so. But the 3d section of the 6th article of the constitution was not intended to confirm any such contract or indenture. It simply holds parties, who being free'to contract, had voluntarily done so, to a specific performance of their contract. It operates on no other indenture than such as “ were entered into without fraud or collusion,” and these being good and valid, even under the compact, as not imposing upon the person indentured involuntary servitude, it does not, and was not intended to, confirm indentures originally void. Between the constitutional provision in reference to indentured servants, and the 6tb article of fclie compact, there is therefore no incompatibility. It follows from this view of the case, that the fact, that the defendant in any case pleads and may be able to prove, that the indenture or contract, on which he bases his claim to the service of the plain tiff, was entered into strictly in conformity to law, may not always be conclusive of his right to sucli services. The replication may, in such case, allege fraud, misrepresentation, or coercion, in procuring the execution of such indenture or contract, and under the constitution, as -he would have been under the compact, the plaintiff will, on sustaining such allegation, by proof, be entitled to a discharge from further servitude. It is, however, otherwise in regard to registered servants, and the issue of indentured servants. Their services were originally claimed without any contract or agreement, on their part, to serve their masters; they were therefore held in a state of involuntary servitude, under the territorial laws, and, as I think, in violation of the compact. It does not however follow, that the constitutional requisition, on them, to serve out the time for which, under the territorial law, they were bound to serve, is void, for repugnance to the compact. The convention, when about to establish an organic law for the state, find, within its territorial limits, a class of persons whom they do not choose to recognize as citizens, and who, consequently, will owe no allegiance to the state ; and they claim the right, in the exercise of the police power incident to their sovereignty, to require such persons, for a specific time, to serve a certain class of their citizens; and congress, having the sole power, if it existed anywhere, to repudiate their claim, affirm it. The [* 848] people of the state, through their convention, assert, and the original states, through congress, admit, either that the persons on whom this provision of the constitution is to operate, are not thereby to be held in involuntary servitude, within the meaning of the compact; or else, that the condition of those persons may be fixed by the constitution, the inhibitions of the compact to the contrary notwithstanding. The difference, then, between this class of servants, and such as “have been bound to service by contract or indenture,” is that the constitution operates directly upon the former, as a class of persons, upon the latter, only through “the contract or indenture,” by which they bound themselves, holding them, in certain cases, to a specific performance of such “ contract or indenture.” But the counsel for the appellant contend that this provision of the constitution is repugnant to the compact, and therefore void: 1. Because the compact is a law of congress, within the meaning of the 2d clause of the 6th article of the constitution of the United States, and as such, is “ the supreme law of the land,” and so to be regarded by this court, “anything in the constitution of this state to the contrary notwithstanding.” 2. Because the compact is unalterable, except by the consent cf the original states, individually given, in the same manner that they would be required to assent to an amendment of the constitution of the United States, and that such consent not having •been given, it is still in force in this state, so as to render wholly null and void the provisions of our constitution, said to ' be repugnant to it. These views of the counsel I consider incorrect. The compact is not a law of congress, as contended by them. Such a law could never be repealed by resolution, but at any time might be by law; whereas the compact, being unalterable, except by the “ common consent” of the original states, and the people and states in the north western territory, could not be repealed or altered without such consent, even bylaw. But, although an act of congress alone could not alter or repeal the compact, yet a resolution of congress expressing or implying, as they lawfully might do, the assent of the original states to a proposition made by the people of any state or territory within the north western territory, for its alteration or repeal, would certainly effect that object. Then, if any provision of our constitution is in anywise repugnant to the compact, the latter has been, to the extent of such repugnancy, repealed by the former. The consent of the people of the state, to such alteration or repeal of the compact, has been sufficiently manifested, by engraft-ing such provision upon their constitution, and that of the original states, by the resolution of congress admitting the state into the Union, without objection to the constitution; and this is the “ common consent ” required for such purpose [*349] by the terms of the compact itself. This position, first assumed by this court in the case of Phœbe v. Jay, Breese 207, has been most fully sustained and fortified by the circuit court of the United States for the district of Ohio, in the case of Spooner v. McConnell, 1 McLean 343 (the authority relied on by the counsel for the appellant in support of a different position). Judge McLean, in delivering the opinion of the court in the latter case says: “It maybe admitted that any provision in the constitution of the state (Ohio) must annul any repugnant provision contained in the ordinance. This is within the terms of the compact. The people of the state formed the constitution, and it was sanctioned by congress, so that there was the ‘ common consent ’ required by the compact to alter or annul it.” But the counsel for the appellant contend that inasmuch as the convention, in the preamble to the constitution, and congress, in their resolution admitting the state into the Union, expressly declare that the constitution is inconsistent with the compact, they cannot be supposed to have consented that by the establishment of the former the latter should be in any wise repealed or altered. This argument is plausible, but will not bear the test of scrutiny. ' Generally the parties who make a contract and receive to themselves the power to alter or rescind it, are competent to say that certain acts purporting to have been done under such contract were so done under it, and within its meaning; and by such admissions they are bound. To this general rule, as to all others, there are exceptions; but this case does not come within any of them. The state and congress, by their “common consent,” could exercise supreme control over the matter, and could therefore as well give effect and operation to the constitution by agreeing that none of its provisions were repugnant to the con-pact, as by declaring expressly that any particular provision assailed by the former should be abolished. The effect of affirming the constitution by the “ common consent” of the convention and congress is the same, whether such affirmance is made on the alleged ground that there is no inconsistency between that instrument and the compact, or by means of an express repeal of the latter. In either case their “ common consent ” is clearly manifested to give full force and effect to the constitution, and if it be repugnant in any of its provisions to the compact, pro tanto to repeal the latter. But the counsel for the appellant further contend, secondly, that if the 3d section of the 6th article of the constitution is not void for the reason assigned by them, but is, on the other hand, operative to make good and binding indentures entered into under the territorial laws as between the original parties thereto, [*350] yet, non constat, that it confirms the assignment of such contracts. The ingenuity of the argument urged by the counsel in support of this position is equaled only by its unsoundness. The language of the constitution is that “ each and every person who has been bound to service by contract or indenture, in virtue of the laws of the Illinois territory heretofore existing, and in conformity to the provisions of the sáme, without fraud or collusion, shall be held to a specific performance of their contracts or indentures.” Is there anything in.this language to justify the construction pub upon it, that although a person had been bound to service by indenture in the manner specified by it, he should nevertheless not be held to a “specific performance ” of such contract, because it had been assigned ? Had such person been any the less “ bound to service ” within the meaning of the constitution because of such assignment ? Assuredly not. “ The territorial Ruts” referred to in tlie constitution authorized not only the making but also the assignment of indentures, and when assigned required the persons bound thereby to serve the assignees thereof, as they would have been required without assignment to have served the original holders of such indentures. The assent of the person bound to the assignment of his indenture amounted to a contract on his part to serve the as-signee of such indenture. Indentured servants were therefore as much “ bound to service,” in virtue of the laws of the Illinois territory, and in conformity to the provisions of the same, “where their indentures had been assigned, as where they had not,” and consequently the constitution operates to confirm as well the assignment of indentures as the indentures themselves in cases where such indentures and assignments had been procured “without fraud or collusion.” To state this position is, in my estimation, to demonstrate its correctness. The only position of the counsel for the appellant remaining to be noticed is, thirdly, that if indentures and assignments, under the territorial laws, were confirmed by the constitution, the state legislature nevertheless had no power to legislate further on the subject, and that consequently the law of 1819, and all acts done under it, are null and void. The answer to this view is obvious. The legislature of a state, unless restrained by constitutional inhibitions from doing so, may make what regulations its members, in their discretion, deem proper, in reference to the transfer of contracts and property within their jurisdiction, having due respect to the rights of contracting parties and owners of property. The constitution of our state recognizes the indentures under consideration as valid and binding contracts, and neither that instrument nor the constitution of the United States, nor any treaty nor law of Congress, made under the latter, imposes any restrictions upon the power of the legislature, to provide by law for the assign- [*351] ment of such indentures, by the free and full consent of the persons bound thereby. How then has the legislature transcended its legitimate powers, in making such provision? I confess that if it has done so, I cannot perceive it. Again : By the doctrine of the common law, a master is held to have property in the services of his apprentice, assignable by the consent of the apprentice, so as to vest in the assignee, a legal right to such services, when the person of the apprentice accompanies the assignment. The law of 1819 may therefore be considered as merely declaratory of the common law, and making the indentures, as it does, assignable only by the consent of the servant, it authorizes no act by which lve can possibly be reduced to a state of involuntary servitude, but leaves his condition wholly unchanged. It only remains to be added, tliafc not one of the authorities relied upon by the counsel for the appellant conflicts in the least degree with any of the views hereinbefore expressed, except the case of Phœbe v. Jay, Breese 207, where the same conclusion is sustained by different reasoning. In every aspect in which I can view this case, I am convinced that the circuit court decided correctly in overruling the demurrer to the appellee’s plea. Catón, Justice, delivered the following separate opinion : I agree to this decision, but I do not concur in all of the positions laid down by my brethren of the majority. I think it was not the design of the framers of the constitution to make indentures valid which were before void, and reduce to a state of involuntary servitude, those who wére legally free, but only to continue those which were before obligatory. If the indentures were obtained by fraud or collusion, they were not legalized, and whether they were so obtained or not is a question of fact, and not of law. Judgment affirmed.